IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Delia Saboya                        )
                                    )
            Plaintiff,              )
                                    )
                                    )
      v.                            )  Case 12 CV 9094
                                    )
                                    )
Segerdahl Group Graphics,           )
                                    )
            Defendant.              )
                                    )

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Delia Saboya lost her job in the sales department of defendant Segerdahl in October of 2009, after her yearly sales—which had been among the company's highest from 2004 to 2006—fell precipitously in 2007 and continued to dwindle thereafter. Defendant says it terminated plaintiff for poor performance, but plaintiff claims she was fired for complaining to human resources about sexual harassment by her male supervisors and colleagues. In this action, plaintiff asserts claims of harassment, retaliation, and termination in violation of Title VII of the Civil Rights Act of 1964.

Before me is defendant's motion for summary judgment on each of plaintiff's claims. For the following reasons, I grant the motion in part and deny the remainder without prejudice.

Plaintiff is a sales professional with nearly thirty years' experience in the commercial printing business, and particular expertise in point of purchase ("POP") sales.[1]  Defendant hired her in 2003 to manage and develop defendant's nascent POP business and also to work as a sales person.  At the time she was hired, plaintiff had a book of business exceeding two million dollars in annual gross revenue, which she brought with her to defendant.  Because one of plaintiff's clients, IMS, had an office that worked closely with one of defendant's clients, McDonald's, plaintiff was told shortly after her hire that she was not to solicit business from that IMS office ("IMS Oak Brook").  Plaintiff continued, however, to solicit business on defendant's behalf from another IMS office.  The relevance of these facts will become clear shortly.

Plaintiff's first few years in defendant's employ were apparently successful.  In February of 2004, plaintiff received an employee evaluation in which she was given a total score of "outstanding."  Pl.'s L.R. 56.1 Stmt., Exh. 16.  Two other, undated evaluations similarly rate her as outstanding overall, and all three evaluations include hand written notations

---

[1]  As is appropriate at the summary judgment stage, this recitation construes the record in the light most favorable to plaintiff and resolves all evidentiary conflicts in her favor. *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012).  Where relevant, disputes are noted.

praising certain specific aspects of her work. *Id*. From 2004-2006, plaintiff exceeded $2 million in sales, which was among the highest of any salesperson. Pl.'s L.R. 56.1 Stmt., ¶ 93.

Plaintiff's sales dropped abruptly in 2007, however, and they continued to decline until her termination in 2009. Plaintiff attributes the sudden drop in her sales to the loss of one of her accounts, IDL. According to plaintiff, she lost the IDL account "because Segerdahl Graphics printed a job incorrectly and did not take action in trying to save this account." Saboya Dep., Def.'s L.R. 56.1 Stmt., Exh. 2 at 38:1-3. In plaintiff's view, defendant "did not handle it professionally." *Id*. at 39:21. Plaintiff offers a similar explanation for the decline in her 2008 sales, stating that in that year, she lost another client, Media on the Run, because defendant did not perform a job correctly. *Id*. 57:13-58:2.

From 2003 through 2007, plaintiff was paid a salary of $300,000 annually, plus commissions. Beginning on January 1, 2008, however, her compensation structure was changed so that she was paid an annual "draw" of $120,000 against commissions. Pl.'s L.R. 56.1 Stmt., Exh. 27. Plaintiff was told that the change in her compensation was due to "loss of sales," which she understood to mean her loss of the IDL account. Saboya Dep. at 37:11-22. Plaintiff objected to the change because, as noted above, in her view it was defendant's fault that she lost the

account. *Id*. at 39:16-22. Plaintiff's draw was further decreased, in February of 2009, to $100,000 annually as a result of her loss of the Media on the Run account, which plaintiff likewise attributes to defendant's failure to "perform correctly." *Id*. at 56:21-58:2; Pl.'s L.R. 56.1 Stmt., Exh. 36.

The parties are in substantial, if not perfect, agreement about plaintiff's annual sales figures for the years 2004 to 2006, when they agree that she generated over $2 million in sales in each of these years, and they further agree that her sales fell to roughly $1.4 million in 2007. They further agree that her 2008 sales were lower still, but they disagree about the extent of the decline. Defendant claims that her sales dropped to $730,622 that year, while plaintiff points to a document she claims suggests that her sales were still in the neighborhood of $1.4 million.[2] The parties again agree that as of her termination in October of 2009, plaintiff had generated approximately $550,000 in sales for that year. Pl.'s L.R. 56.1 Stmt., Exh. 15.

---

[2] Plaintiff does not clearly assert what she believes her total sales to have been in 2008. She objects to the admissibility of defendant's evidence—an exhibit to the declaration of its Controller, Julie Cleary—as a "summary of a summary," and she further disputes defendant's calculation of her sales, citing a chart she identifies only as a "document[] produced by Defendant," which she claims shows that her 2008 sales were approximately $1.4 million, although a document plaintiff relies on for her putative comparators' sales indicates that her own sales were $741,851 that year.

Over the years of her employment, plaintiff complained about a host of "unprofessional" conduct she perceived among her colleagues and supervisors. Usually she complained to Laurie Velez, defendant's human resources manager, and sometimes to her direct supervisor, Terry McLaughlin, or to Jeff Reimers, another executive she considered her boss. According to plaintiff, these complaints were ignored or laughed off. For example, in approximately 2004 or 2005, plaintiff told Velez, Reimers, and McLaughlin that she no longer wanted to supervise a male colleague because he had been stalking her. Reimers and McLaughlin responded by telling plaintiff that if she hadn't slept with the colleague (a fact plaintiff denies), then he would not be stalking her, and treated the issue "like if it was a joke." Saboya Dep., Def.'s L.R. 56.1 Stmt., Exh. 2 at 220:8-221: 21.

Plaintiff also complained to Velez and Reimers, sometime before 2007, that another coworker, Paul Langos, walked into her office while she was on a conference call with a client and screamed at her and called her a bitch. Plaintiff testified that Reimers's response was to call Langos to his office, and then, addressing plaintiff and Langos jointly, told them, in front of Velez, that they should "go to a cabin and fuck all day

and get [their] problems solved."[3]   Plaintiff states that Velez,
Reimers, and Langos all laughed, and that no further action was
taken.   *Id.* at 49:10-50:16.   Plaintiff complained about Langos
on a separate occasion as well, after he inadvertently sent the
entire company an email asking whether a new female employee had
"big boobs."[4]   Saboya Dep. at 229:8-18.

Then, sometime between 2004 and 2007, a colleague named Ed
Anderson was "rude" to plaintiff about a job and "got very
close" to her and pushed her with his chest so that she had to
put her hands up to stop him.   *Id*. at 112:18-22; 140:23-24.
Plaintiff immediately called Reimers on his cell phone to report
the incident. Reimers advised plaintiff to pass the job on to
someone else, which she did.   *Id.* at 143:2-11.   Reimers later
told plaintiff that "no action [was] going to be taken because
[plaintiff and Anderson] were both good employees."   *Id.* at
144:15-17.   Plaintiff had no further conflicts with Anderson
over jobs thereafter.   *Id.* at 144:7010.

---

[3] In her interrogatory responses, plaintiff claimed that Reimers
said "that she and *White* [i.e., not Langos] should 'rent a
cabin' and '[have sexual intercourse]' in order to try and work
out the problem between them." Exh. 17 to Seboya Dep., Def.'s
L.R. 56.1 Stmt, Exh. 2 (emphasis and bracketed material added).
Because all other references to this incident identify Langos,
not White, I assume this reference to White was in error.
[4] The parties dispute whether Langos was reprimanded for this
incident, but it is undisputed that Langos did not receive an
"Employee Warning Report" because of it.

Plaintiff also complained about work disputes involving Reimers or Paul White, another senior executive who screamed at plaintiff and used profanity on multiple occasions. *See, e.g.,* Saboya Dep., Def.'s L.R. 56.1 Stmt., Exh. 2 at 42:3-7; 159:3-160:4. For example, sometime between 2005 and 2007, after one of plaintiff's clients complained about a print job, White yelled at plaintiff and called her client a "fucking losing client." *Id*. at 41:4-15. According to plaintiff, White "always raised his voice and always spoke unprofessionally" in the course of work disputes. Plaintiff reported White's use of profanity to Velez, but Velez told plaintiff it was "out of her hands," and that "the guys" (i.e., defendant's senior executives, all of whom were men) would not take her complaints seriously. *Id*. at 45:3-47:4.

In addition, plaintiff testified that Reimers threatened plaintiff "more than a few times" that she would lose her job, or that he would throw her desk or her paperwork "onto the street or onto the grass." *Id*. at 207:4-16. Plaintiff stated that whenever she approached Reimers about work problems "it always ended up that I was threatened that I was going to lose my job." *Id*. at 208:21-24.

Plaintiff asserts that the situation worsened beginning in 2006, when Reimers became Executive Vice President, and states that she began documenting her complaints in emails to Velez in

2007. In the first of these emails, dated February 11, 2007, plaintiff recounted "three unprofessional confrontations" that had occurred in the previous year. The subject line of this email was "For the Record." Exh. 9 to Saboya Dep., Def.'s L.R. 56.1 Stmt., Exh. 2, at 1.

The first incident plaintiff described was the one in which Langos had called her a bitch. Plaintiff wrote that Langos "rudely entered [her] office speaking unprofessionally loud and addressing with foul language while I was in a conference call with my client," then went on to state, "Laurie did speak to Paul but management laughed about it as if it was a joke…. In other words it was swept under the carpet." *Id*. The email did not state that Langos used the word "bitch," nor did it mention Reimer's comment about the cabin in the woods.

The second confrontation plaintiff described was the incident involving Ed Anderson. Plaintiff complained that Ed "spoke to [her] rudely because he did not want to finish his job that the client asked for," and "came up very close to [her] face like he was very angry." *Id.* She complained that this incident, too, had been "swept under the carpet." *Id*.

Regarding the third "confrontation," plaintiff explained that a colleague named Fred "has a medical condition that makes him get a bit excited and rough. This happens to Fred often at work. On one of his outburst[s] I happened to be walking by the

estimating department when Fred grabbed me and squeezed me like a huge bear hug." Plaintiff stated that although she "wasn't hurt in any way,"[5] she told Fred's supervisor that he "needed to sit and talk to Fred to make sure something like this did not happen again." This matter, she believed was likewise "swept under the carpet." *Id*. at 2.

Plaintiff complained in her email that the employees involved in these incidents were not reprimanded for their conduct, whereas she had been reprimanded for "so call[ed] unprofessional action." *Id.* Indeed, five days earlier, on February 6, 2007, plaintiff had been issued an "Employee Warning Report" for shouting and using profanity during a work dispute with colleagues. Saboya Dep., 115:11-117:9 and Exh. 8. Plaintiff signed the report, checking a box to indicate that she disagreed with it because, in her hand-written notation, "other conduct violations were done to me from others and the action of the conduct was not handle[d] the same." Saboya Dep., Exh. 8.[6] Plaintiff did not indicate, either in her comment or in her email to Velez, that she believed the discrepancy she perceived was related to her gender.

---

[5] At her deposition, plaintiff testified that she was indeed hurt by the bear hug. Saboya Dep. at 145:10-22.

[6] It is undisputed that none of the employees involved in the incidents plaintiff complained about received an "Employee Warning Report" as a result of the conduct she reported. Pl.'s L.R. 56.1 Stmt. ¶ 106.

In late 2007, "issues" arose involving responsibility and credit for the IMS account. *See* Exh. 10 to Saboya Dep. at 4 (10/29/2007 email from McLaughlin to Saboya ("I understand that there's some 'issues' with IMS regarding commissions, sales volume, and who's calling on the account.")). In a series of emails among plaintiff, McLaughlin, White, Reimers, and Velez, plaintiff complained that sales she had made to IMS had been wrongly credited to a coworker named Don Farell. McLaughlin told Saboya, "[a]s of January 1, 2008 all IMS sales responsibilities will be transferred to you along previous sales number for future tracking. Paul, Jeff, and I are well aware of your impact on this account and its importance to you and the Segerdahl Group." *Id*. at 3 (11/5/07 email from McLaughlin to Saboya, White, and Reimers). He further stated, however, that "[w]ith only a month and a half remaining in the year it makes no sense to re-do the books to capture 2007 sales numbers." *Id*. The ensuing emails make plain that plaintiff was not satisfied with this response, nor with Reimers's indecorous dismissal of her further efforts to resolve the matter.[7] Plaintiff did not indicate, however, that she believed the failure to credit her for these sales was related to her gender. The record does not

_____

[7] The last email in the chain is from plaintiff to Velez alone and states, "Jeff laugh (sic) and felt that quote "I don't give a shit about your report, it's just a report. Terry acted helpful but Jeff was a total ass!!" Exh. 10 to Saboya Dep. at 1.

reveal whether plaintiff's compensation (which at that time included both salary and commission) was affected by the apparent misallocation of her 2007 sales to IMS.

Then, sometime in 2008, plaintiff complained about a sexually suggestive DVD that was shown at a sales meeting that year. The video depicted a male employee sitting at his desk, then a second male employee who emerges from beneath the desk wiping his mouth in a manner suggesting that he had performed oral sex on the seated employee. Plaintiff testified that despite her verbal complaint to Velez, "[t]here was no apology letter. There was nothing said to anyone in the company for how unprofessional it was." Saboya Dep. at 244:22-24.

In March of 2009, plaintiff sent Velez a three-page email with the subject "Information for my files," and the description "Confidential." Exh. 11 to Saboya Dep. at 1. The email began: "For the past 2 year[s] I have experienced constant threats with my job," then went on to recount seven work-related disputes involving Reimers and/or White between February of 2007 and March of 2009. *Id*. Plaintiff described being "yelled at" and called a "liar" in the course of several of these, and that in a few, Reimers said he "should pack [her] office in a box and throw [her] out in the grass." *Id.* at 2-3. In one instance, Reimers "almost threw his screen from his computer at [her]" and

called one of her clients "that fucking dyke girl." *Id.* at 3;
Saboya Dep. at 201:15-204:18.

According to plaintiff's account, several of these disputes
ended in apologies to her or in similar détantes. For example,
plaintiff described one dispute with White as concluding with
White giving her "a hug and kiss on the cheek." Plaintiff
stated that she did not interpret these gestures "in anyway as a
sexually (sic) advance," but instead "as an act of a nice person
asking for forgiveness for his action only." Exh. 11 to Saboya
Dep. at 2. At the end of the email, plaintiff stated, "I hope
that this information never goes anywhere but your files and
that I never lose my job here at Segerdahl for any reason." *Id.*
Plaintiff does not claim that Velez communicated the email, or
its contents, to anyone.

Finally, in an email dated October 15, 2009—one day before
plaintiff's termination—plaintiff wrote to Velez:

> I talk[ed] to Mr. Paul White on his cell phone to ask
> why he made an appointment with my client IMS his
> answer was that he is thinking of putting a new sale
> person on the account (IMS) and that he does not think
> I should be at Segerdahl any more. Paul White has
> treated me badly before and with no respect. Moving
> forward I will not be in any calls with Paul or in a
> room without you there (HR). I am tired of how he
> talks to me and treats me.

10/15/2009 email from Saboya to Velez, Exh. 13 to Saboya Dep.,
Def.'s L.R. 56.1 Stmt., Exh. 2.

A "Separation Report" dated October 16, 2009, identifies the reason for plaintiff's separation, among various options pre-printed on the form, as "Inability or Unsatisfactory Job Performance." Exh. 20 to Saboya Dep. A hand-written notation adds, "Sales were low and she is in the hole. As of August 2009, she is approx. $64,000 in the hole." *Id*.

Plaintiff filed a timely EEOC charge and received a right to sue letter dated August 24, 2012. This action ensued.

## II.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). I resolve all factual disputes in plaintiff's favor and give her "the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012).

### 1. Harassment claim

To withstand summary judgment of her harassment claim, plaintiff must "produce evidence that the alleged harassment was severe or pervasive," and she must further establish that a reasonable jury could conclude that the "hostile conditions were

because of her sex." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). The first requirement is "disjunctive," meaning that it may be met with even a single incident of extremely serious harassment, or, alternatively, with a pattern of less severe but persistent harassment. *Id*. Both elements require an examination of the totality of the circumstances. *Id*. at 331.

Having reviewed the record closely, I conclude that plaintiff's claim meets neither requirement. First, the few incidents that included sexually offensive remarks or conduct— the insinuation that plaintiff had had sex with a stalker; the episode in which Langos called her a "bitch," and Reimers compounded the offense with a vulgar joke; the "big boobs" email; the sexually suggestive DVD[8]; and Reimers's use of the phrase "fucking dyke" to refer to one of plaintiff's clients— were neither severe nor pervasive enough to have crossed "the line that separates the merely vulgar and the mildly offensive from the deeply offensive and sexually harassing." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431 (7th Cir. 1995). None of the incidents plaintiff complains about bears the hallmarks of truly egregious sex harassment, such as unwelcome sexual

---

[8] While it is not obvious to me that a video depicting oral sex between male coworkers is more offensive to women than it is to men, I assume for present purposes that a jury could find that playing such a video at a workplace function supports a claim for sex-based harassment.

contact, sexual solicitations or threats, or pornographic images. *See id*. Nor can these five, unrelated incidents spread over a six-year period reasonably be considered to have altered the conditions of plaintiff's employment. *See, e.g., Cowan v. Prudential Ins. Co. of America,* 141 F.3d 751, 758 (7th Cir. 1998) (rejecting claim based on "sporadic," non-severe incidents spread over two years) (citing cases).

Moreover, this handful of sexually tinged incidents does not reasonably support the inference that an anti-female animus motivated any of the facially gender neutral conduct plaintiff complains about. *Cf. Hall*, 713 F.3d at 333-34 (even where most of supervisor's conduct was "devoid of gender-specific indicia," two comments explicitly referencing plaintiff's gender were sufficient to allow jury to conclude that his harassment of her was sex based). Nearly all of the incidents plaintiff complains about reflect ordinary work disputes over matters such as reimbursements for expenses, the handling of client complaints, credit for sales, and the like. Most involved Reimers and/or White, but of the two, only Reimers is alleged to have used a gender specific insult at any time, and he did so only once, when he called plaintiff's client a "fucking dyke." Indeed, plaintiff did not claim, in her emails to Velez, that these disputes were related to her gender. These incidents simply do not add up to pervasive, sex-based harassment. *See Vance v.*

*Ball State University*, 646 F.3d 461, 472 (7th Cir. 2011) ("Title VII is "not…a general civility code" and we will not find liability based on the "sporadic use of abusive language.")

Plaintiff tries to gain traction for her claim by portraying Reimers' and White's yelling, swearing, and threatening as "regular," and by likening her case to *Hall v. City of Chicago*, 713 F.3d 325 (7th Cir. 2013). But the record does not support her comparison to *Hall*. True, plaintiff testified that White and Reimers "always" yelled, swore, or threatened to fire her during work disputes. But even if these disputes had somehow been related to plaintiff's gender, nothing in the record suggests that they were so frequent as to have had a material effect on her working conditions. Plaintiff does not claim, for example, that conflicts with Reimers or White arose every day, every week, or with any particular frequency at all. *Cf. Dey v. Colt Cons. & Development Co.*, 28 F.3d 1446, 1456–57 (7th Cir. 1994) ("daily comments, gestures, and innuendo of a sexual nature," coupled with five "extremely offensive" incidents sufficient to support harassment claim).

Moreover, the facts of this case are nothing like those in *Hall.* In that case, the plaintiff's supervisor assigned her nothing but useless, menial work; excluded her from every meeting; and forbade her coworkers from speaking to or associating with her. 713 F.3d at 328–29. The court concluded

that although the supervisor's conduct was not severe, it "was designed to ostracize [the plaintiff] from the rest of the Division" and to make her "a pariah, undeserving of human interaction." *Id.* at 325. The court likened the case to *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678 (7th Cir. 2001), and *Pucino v. Verizon Wireless Communications*, Inc., 618 F.3d 112 (2d Cir. 2010)), in which the alleged harassment, although "relatively minor," was nevertheless actionable because it "consistently or systematically burden[ed] women throughout their employment." *Id.* at 331-32. That is not a reasonable interpretation of the record here. However obnoxious the tone of plaintiff's work disputes with Reimers and White may have been, the evidence does not suggest that they "ostracized" her from her colleagues or barred her from doing meaningful work because she is a woman.[9]

In short, even viewing the facts in the light most favorable to plaintiff, a jury could not reasonably conclude on this record that plaintiff was subjected to sex-based harassment that was so severe or pervasive that it effectively altered the

---

[9] The closest plaintiff comes is with the argument that Reimers discriminatorily "blocked" her from calling on one of IMS's offices, but that argument finds no support in the facts because plaintiff concedes that she was told upon her hire in 2003—long before she claims Reimers began harassing her—that she would not be allowed to call on IMS's Oak Brook office because of defendant's preexisting relationship with another client at that location.

conditions of her employment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

## 2. Retaliation

In her retaliation claim, plaintiff asserts that after she began memorializing her complaints about her supervisors' and colleagues' misconduct in emails to Laurie Velez in 2007, defendant launched a campaign of retaliation that culminated in her termination two years later. Plaintiff identifies the following pre-termination actions as retaliatory: the failure to credit plaintiff for certain IMS sales in 2007; "blocking" plaintiff from calling on IMS Oak Brook; mishandling her clients' complaints about botched print jobs; denying her request for reimbursement of certain work expenses; and changing her compensation structure from salary plus commissions to commission only. Her theory seems not to be that any of these actions was prompted by a specific complaint (at least, she does not assert any causal relationship between a specific complaint and a specific retaliatory action), but rather that her ongoing complaints caused defendant to perceive her as a "troublemaker," and retaliated against her for "pestering."

Plaintiff's theory does not survive summary judgment because even viewing the facts in the light most favorable to her, the evidence does not establish any plausible causal

connection between her complaints and any of the challenged actions.

To prevail on her retaliation claim, plaintiff must show "that the desire to retaliate was the but-for cause" of an adverse employment action. *Ripberger v. Corizon, Inc.,* 773 F.3d 871, 881 (7th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,---U.S.---, 133 S.Ct. 2517, 2528 (2013)). Because the record contains no direct evidence of retaliation,[10] I consider whether a "convincing mosaic" of circumstantial evidence points directly to retaliation as the reason for any of the acts she claims were retaliatory. *See Whitfield v. International Truck and Engine Corp.*, 755 F.3d 438, 443 (7th Cir. 2014).

Plaintiff argues that "suspicious timing" supports the inference that she was terminated because of her complaints to human resources, noting that she sent an email to Velez complaining about White on Thursday, October 15, 2009, just one day before her termination. But Velez was not involved in the decision to terminate plaintiff, and there is no evidence that Velez communicated plaintiff's October 15 email, or its

---

[10] There is no merit to plaintiff's assertion that Reimers's and White's threats to fire her, or their unspecified conduct that "made her feel like she was being a trouble-maker and pestering them" are "tantamount to admissions of retaliatory conduct." Direct evidence need not be a "virtual admission of illegality," but it must "prove the particular fact in question without reliance on inference or presumption." *Miller v. Borden, Inc*., 168 F.3d 308, 313 (7th Cir. 1999). The evidence plaintiff cites does not fit this bill.

contents, to any of the decision makers. Moreover, the testimony of multiple witnesses suggests that the decision to terminate plaintiff was made at one of the Monday morning management meetings, i.e., at least three days *before* plaintiff sent Velez the email. *See* McLaughlin Dep., Def.'s L.R. 56.1 Stmt., Exh. 6 at 215:19-24; Gardner Dep., Def.'s L.R. 56.1 Stmt., Exh, 5 at 116:7-13; 117:17-22; Reimers Aff., Exh. 54 to Reimers Dep., Def.'s L.R. 56.1, Exh. 7. While it is true, as plaintiff insists, that a finder of fact need not believe these witnesses, plaintiff does not point to any evidence in the record that casts doubt on this aspect of their testimony.

Plaintiff's secondary "suspicious timing" argument is that because all of the allegedly retaliatory actions occurred after 2007, they must all have been the result of the complaints she began to send to Velez by email at that time. But this argument lumps together unrelated conduct that plaintiff attributes to multiple actors throughout a two year period, without any attempt to show temporal proximity between any two events. Moreover, plaintiff offers no evidence to establish that the individuals responsible for the challenged conduct even knew about her emails to Velez, one of which plaintiff designated "confidential" and specifically asked Velez to keep in her "files" and not to share. Exh. 11 to Saboya Dep.

Nor does plaintiff's putative evidence of defendant's "better treatment" of two co-workers point directly to a retaliatory motive for her termination. Plaintiff observes that neither a female colleague who verbally complained about the "big boobs" email, nor a male colleague who complained in writing about a non-executive employee, was fired. Without anything more in the way of factual support, she then leaps to the conclusion that her own termination must have been retaliatory. But these unadorned facts, standing alone, plainly do not amount to direct evidence of discrimination, nor, indeed, do they allow for the kind of "meaningful comparison" necessary to establish the fourth element of a prima facie case of retaliation: that similarly situated employees who did not engage in protected activity received better treatment. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (to evaluate whether a comparator is similarly situated, "[t]here must be "enough common factors ... to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.") (citation omitted) (ellipses in original).

The remainder of plaintiffs' evidence, which she characterizes as "bits and pieces," are just that, and do not support, individually or cumulatively, the inference that any of her complaints, or her "troublemaking" generally, was the "but-for cause" of the conduct she claims was retaliatory.

### 3. Termination

I am not persuaded, however, that the record reflects no triable issue on the question of whether plaintiff's termination was discriminatory. Plaintiff has produced at least some evidence that she was meeting her employer's legitimate expectations (her positive performance evaluations, as well as her total sales figures, which were among the company's highest for several years running), and that male sales employees with total sales lower than hers were not terminated for "low sales." As these are the only contested elements of her prima facie case, I am satisfied that she has carried her initial burden, which shifts the burden to defendant to produce "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *E.E.O.C. v. Our Lady of Resurrection Medical Center*, 77 F.3d 145, 149 (7th Cir. 1996) (original emphasis). Defendant has produced some evidence (plaintiff's separation report) to suggest that its decision to terminate plaintiff was based not only on low sales, in absolute figures, but also on the fact that she was "in the hole" (i.e., that her draw exceeded her earned commissions). Yet, the record does not appear to contain sufficient evidence to make a meaningful comparison between plaintiff and her putative comparators on this issue, nor do the parties address it in their briefs. Accordingly, I am unable to ascertain

whether defendant's stated reasons for plaintiff's termination negate the presumption of discrimination raised by the prima facie case and shift the burden back to plaintiff to show that these reasons were pretextual.

Mindful of the substantial cost associated with a trial, I direct the parties to supplement the record as follows so that I can determine whether plaintiff's discrimination claim has a chance of success on the merits. Defendant is ordered to file, within thirty days, additional factual statements, not to exceed ten in number, setting forth the "draw" versus earned commissions of plaintiff and of the three comparators she identifies in her L.R. 56.1 statements for the years 2008 and 2009. To the extent it has not done so already, defendant must produce to plaintiff any underlying records or information on which its additional factual statements are based, and plaintiff shall be entitled to examine a witness competent to testify about these records or information before filing a response, if any, within forty-five days of defendant's initial submission. To the extent plaintiff disputes defendant's calculations, she must identify specific evidence supporting an alternative calculation.[11]

---

[11] Although plaintiff has disputed defendant's evidence supporting its calculations with respect to her own compensation and commissions, she has not, thus far, offered any competent competing evidence or alternative calculations. While she is

23

III.

For the foregoing reasons, defendant's motion for summary judgment is granted with respect to plaintiff's harassment and retaliation claims, and denied without prejudice with respect to her termination claim.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: March 27, 2015

---

correct that a fact-finder need not credit defendant's testimony or other evidence, she should nevertheless be mindful that it is she who bears the ultimate burden at trial.