IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Delia Saboya | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case 12 CV 9094 |
| | ) | |
| | ) | |
| Segerdahl Group Graphics, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OPINION AND ORDER

In October of 2009, plaintiff Delia Saboya lost her job in
the sales department of the commercial printing outfit Segerdahl
Graphics, after her yearly sales—which had been among the
company's highest from 2004 to 2006—dropped markedly in 2007 and
continued to decline thereafter. Plaintiff filed this lawsuit
claiming that defendant fired her not because of her poor
performance but because of her sex, and because she complained
to defendant's human resources manager about sexual harassment
at work. She asserted claims for discrimination, retaliation,
and harassment pursuant to Title VII, 42 U.S.C. § 2000e.

Defendant moved for summary judgment on all of plaintiff's
claims, and on March 27, 2015, I granted the motion with respect
to the harassment and retaliation claims, but I denied it

without prejudice with respect to the claim of discriminatory termination. *See* Mem. Op. and Order of 3/27/15, DN 63. I concluded that plaintiff had come forward with prima facie evidence that she was meeting her employer's legitimate expectations, and that although she was ostensibly terminated for "low sales," three male employees—Terry McLaughlin, Steve Peshek, and Milt Sousanis—whose sales were lower than hers were not terminated. *Id*. at 22. *See also* Pl.'s L.R. 56.1 Stmt. ¶ 130. Defendant had argued that none of these individuals was similarly situated to plaintiff, and it produced some evidence to show that plaintiff's termination was based not on her low sales volume per se (which, indeed, was not lower than her putative comparators'), but rather on the significant decline in her sales over time, and the fact that despite successive reductions in her compensation, the "draw" she received against anticipated commissions had consistently outpaced the commissions she actually earned. Because the record did not allow me to examine whether plaintiff's putative comparators had likewise been compensated in excess of their commissions, I ordered defendant to supplement the record so that I could ascertain "whether defendant's stated reasons for plaintiff's termination negate the presumption of discrimination raised by the prima facie case and shift the burden back to plaintiff to show that these reasons were pretextual." DN 63 at 23. I

further advised plaintiff that to the extent she disputed defendant's evidence supporting its calculations of her compensation or commissions, she must produce competent evidence to support some alternative calculation. *Id*. at n. 11.

The parties have now filed their additional submissions. For the reasons that follow, I conclude based on the totality of the record that plaintiff's evidence is insufficient as a matter of law for her to prevail on her discrimination claim.

I.

To determine whether summary judgment is appropriate, I must examine the record in the light most favorable to plaintiff, resolve all evidentiary conflicts in her favor, and grant her all reasonable inferences the record permits. *Liu v. Cook County*, ---F.3d---, 2016 WL 1019324, at *1 (7th Cir. 2016). Because my previous summary judgment decision recited the facts of the case in significant detail and considered them under the same legal standard as applies here, I will not narrate the facts exhaustively again. Instead, I will assume familiarity with my previous decision and will focus here on the evidence bearing specifically on plaintiff's claim of discriminatory termination.

Defendant hired plaintiff into its sales department in 2003 on the understanding that she would bring her preexisting sales accounts—more than two million dollars in business—with her.

Saboya Dep. at 14:24-15:1, Pl's SJ Resp., Exh. 1, DN 37-2.
Plaintiff's job duties included, in addition to sales, managing
and training other sales employees on point of purchase ("POP")
sales, a new division plaintiff would launch and develop for
defendant. *Id.* at 15:5-12; Reimers Dep., at 75:6-15, Pl.'s SJ
Resp., Exh. 12, DN 46.

Plaintiff did bring her accounts to defendant, and she
continued to exceed two million dollars in annual sales, while
also developing defendant's POP division, until 2006.
Throughout this time, and until the end of 2007, plaintiff was
paid a salary of $300,000 annually, plus commissions. Saboya
Dep. at 25:21-26:2. Effective January 1, 2008, however, her
compensation was changed to commission only, and she was paid an
annual draw of $120,000 against commissions for sales she
generated. Pl.'s SJ Resp., Exh. 27. Her draw was later reduced
a second time to $100,000 on February 8, 2009.

In a declaration accompanying defendant's supplemental L.R.
56.1 statements, defendant's comptroller, Ron Richford, states
that according to defendant's records, plaintiff's annual sales
dropped from over $2 million in 2006 to approximately $1.4
million in 2007, remained at around $1.4 million in 2008,[1] then

---

[1] Defendant initially stated that plaintiff's sales in 2008 had
declined to $730,622 in 2008, but its recent submission
acknowledges that her sales remained steady between 2007 and
2008. I address this issue in a later section.

4

declined again to around $500,000 by her termination in October of 2009. Although plaintiff articulates numerous and lengthy objections to Richford's testimony and to defendant's documentary evidence, she does not dispute that her sales took a sharp downward turn in 2007, nor does she claim (or offer affirmative evidence to suggest) that she was compensated in any other amount, or received commissions in any other amount, than defendant asserts. As I noted in my previous summary judgment decision, plaintiff attributes the decline in her sales to defendant's mishandling of print jobs performed for two of her customers, IDL and Media on the Run, which she claims caused her to lose these accounts. *See* DN 63 at 3-4; Pl.'s L.R. 56.1 Stmt. ¶ 118 (plaintiff lost her "steady work" from IDL and Media on the Run based upon "manufacturing errors" and performance problems). *See also* Saboya Dep. at 76:9-79:2 (attributing her 2009 draw reduction to performance problems on jobs for customers Value City, Niven, Bish, and HALO in the '04-'05 timeframe).

According to defendant, plaintiff's sales results never justified her compensation. *See* Def.'s L.R. 56.1 Stmt. ¶ 12. Defendant acknowledges, however, that because of plaintiff's role in starting up the new POP division, it would have been "detrimental" to compensate her on a draw-against-commissions basis "from that startup point." Pl.'s L.R. 56.1 Stmt. at ¶ 91

and Exh. 12, Reimers Dep. at 75:11-15. Plaintiff's job duties did not change when her compensation structure was changed to commission-only in January of 2008. Pl.'s L.R. 56.1 Stmt. ¶ 116. Her sales, however, continued to fall.

Several of defendant's witnesses testified that plaintiff's unsatisfactory sales were a frequent topic at weekly and monthly management meetings. These meetings were generally attended by defendant's president, Rick Joutras, and other senior managers including Hans Kollinger, Gary Gardner, Paul White, Jeffrey Reimers, and Terry McLaughlin. Joutras testified that concerns about plaintiff's sales were discussed as early as "in the second year of her being with the company," and he stated that she would have been terminated before October of 2009 had he not prevented her termination because of her personal circumstances. Joutras Dep. at 134:12-136:7, 144:12-19, Pl.'s SJ Resp., Exh. 10. Joutras explained that at some point before plaintiff's termination:

> [E]verybody in the room came to the agreement that we were in such a deficit, that we were so under water with this salesperson, that it was time to let her go, I said no. And I said no because she has cancer, she just had a double mastectomy, she's got – she's a single mother, and she's raising a kid. I said give it time.

*Id.* at 144:12-19, Pl.'s SJ Resp., Exh. 10.

Gardner and Reimers confirmed that defendant's weekly and monthly management meetings included discussions about the sales

results of individual sales representatives and "whether or not their commissions [were] sufficient to cover their salary or draw," Gardner Dep. at 67:4-6., Def.'s L.R. 56.1 Stmt., Exh. 5, DN 26-5; *see also* Reimers Aff. at ¶ 8, Exh. 54 to Reimers Dep., Def.'s L.R. 56.1 Stmt., Exh. 7, DN 26-7, and Gardner testified that plaintiff "was discussed at most meetings because she was short of her draw during the entire time she was there." Gardner Dep. at 117:14-16. Plaintiff acknowledges that her sales declined over the course of her employment, and she concedes that the sales and commissions reports attached to the Richford Declaration facially reflect her dropping sales. She does not dispute that these reports are the business records defendant's managers used to evaluate its salespeople's results at their monthly and weekly management meetings. She argues, however, that the reports are inaccurate, incomplete, and unreliable, and she claims that circumstantial evidence suggests that her commissions were in fact sufficient to support her compensation.

As I described in my previous summary judgment decision, plaintiff's six-year employment with defendant was punctuated by a variety of incidents she characterized as "unprofessional confrontations" with her supervisors and peers. Def.'s L.R. 56.1 Stmt., Exh. 2 at Exh. 9. Plaintiff began documenting these incidents in emails to Laurie Velez, defendant's human resources manager, in 2007. The emails described incidents dating back to

2004 or 2005, and they focused on conflicts plaintiff had had with Reimers and/or White, who screamed at plaintiff, used profanity, and threatened to fire her or suggested she quit on multiple occasions. *See id*. Exhs. 9, 11, 13-14. In one such confrontation, Reimers used a sexually offensive epithet, and in another, he made a sexually explicit joke.

In my previous decision, I examined the evidence of these and other "sexually tinged incidents" and determined that, while lamentable, they lacked "the hallmarks of truly egregious sex harassment, such as unwelcome sexual contact, sexual solicitations or threats, or pornographic images," and were too sporadic to support plaintiff's claim for harassment. Additionally, I found that the handful of explicitly sex-based remarks and conduct "[did] not reasonably support the inference that an anti-female animus motivated any of the facially gender neutral conduct plaintiff complains about," noting that nearly all of the conflicts plaintiff described in her complaints to Velez "reflect ordinary work disputes over matters such as reimbursements for expenses, the handling of client complaints, credit for sales, and the like." DN 63 at 14-15. I further determined that the record did not reasonably support any causal connection between plaintiff's complaints to Velez and the conduct she claimed was retaliatory. *Id*. at 18-19.

## II.

I now turn to the issue my previous decision left open, which is whether plaintiff's evidence—though insufficient to support her claims for harassment or retaliation—could nevertheless persuade a jury that she was terminated because she is a woman. Although the parties' briefs devote little attention to the specific claim of discriminatory termination, the "substantive standards and methods of proof" are the same for retaliation and discrimination claims." *Liu*, 2016 WL 1019324 at *7. Here, plaintiff relies on the comparator evidence, coupled with "bits and pieces" of other evidence that she claims "support the inference of discriminatory gender-bias" to establish her discrimination claim.

Although plaintiff could theoretically defeat summary judgment using either the direct or indirect methods of proof, *Liu*, 2016 WL 1019324 at *7, I previously determined that the record contains no direct evidence of retaliation. DN 63 at 19, n. 19. Plaintiff likewise does not identify any evidence that could reasonably be considered to "point directly to a discriminatory reason" for her termination. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012). Accordingly, I again focus on the indirect method of proof, which at this stage requires plaintiff to show that defendant's asserted reason for her termination was pretextual.

To establish pretext, a plaintiff "must present evidence suggesting that the employer is dissembling." *See Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Id*. Indeed, "[i]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id*. (citation omitted).

Plaintiff argues that pretext can be inferred from the following: 1) evidence that her sales were not unsatisfactory; 2) evidence that defendant had no "objective policy or procedure" for deciding when to terminate employees for unsatisfactory sales; 3) evidence that she received positive performance reviews; 4) inconsistencies in defendant's account of who made the decision to terminate her and when; 5) evidence that defendant "caused whatever 'unsatisfactory sales'" she had; and 6) evidence that male salespeople were treated more favorably than she. I address these arguments *seriatim*.

Plaintiff's first argument—that defendant's stated reason for her termination was false because her sales were not actually unsatisfactory—points out that at the time of her

termination in October of 2009, she had "approximately $500,000 in sales," and was "on pace to exceed $725,000 in annual sales." Pl.'s Resp. at 19. But these figures are meaningless in a vacuum, and she does not dispute either that her 2009 sales were far lower than her sales in previous years, or that they were lower than each of her comparators' 2009 sales. In context, this evidence supports, rather than undermines, defendant's stated reason for her termination.

Nor can pretext be inferred from evidence that defendant's stated reason for her termination reflects its "subjective contention" that her sales were unsatisfactory, or that it lacked an "objective policy." As long as the decision maker "honestly believed" that plaintiff's sales were unsatisfactory, plaintiff cannot survive summary judgment. *Coleman*, 667 F.3d at 853 (if defendant honestly believed the reason, no matter how "foolish, trivial, or baseless," then plaintiff loses). Indeed, Title VII does not require employment decisions to be objective, fair, or correct; it requires only that they be non-discriminatory. *See id.* Plaintiff must offer some evidence that defendant's alleged policy was not just "subjective," but that defendant carried out its policy in a manner that systematically favored male employees. As discussed below, however the comparator evidence does not support that conclusion.

Evidence that plaintiff received multiple positive performance reviews over the course of her employment likewise does not suggest pretext. As I noted in my previous summary judgment decision, only one of these evaluations was dated, and it was from February of 2004, when plaintiff's sales were still among the company's highest. Indeed, the undisputed evidence is that plaintiff's sales results remained strong through the end of 2006, so the fact that she received multiple "outstanding" reviews at undetermined times does not suggest that her termination for unsatisfactory sales in 2009—when her sales were a fraction of what they had been from 2003 to 2006—does not raise any inference of pretext.

Plaintiff next argues that pretext can be inferred from defendant's "shifting," "conflicting," and "inconsistent" stories about when the decision to terminate plaintiff was made, and by whom. Having again reviewed the record closely on this issue, however, I conclude that it does not support plaintiff's characterization. Indeed, the putative inconsistencies plaintiff cites—for example, that one witness testified the decision to terminate her was made "through consensus," while another called it "a group decision," even though no vote was taken, and that more than one manager disclaimed individual responsibility for the decision while several stated that they did not recall the specifics—fall far short of identifying "such

weaknesses, implausibilities, inconsistencies, or contradictions" as to lead a reasonable person to discredit defendant's stated reason for her termination. In all material respects, the accounts given by defendant's various witnesses regarding how and when the decision to terminate plaintiff was made are consistent, and nothing about their testimony suggests that the stated reason for her termination was "a lie." *Coleman*, 667 F.3d at 852.

Before moving on to the comparator evidence, I pause to address plaintiff's argument that pretext may be surmised from evidence that Reimers "caused whatever 'unsatisfactory sales' [plaintiff] had." Pl.'s Resp. at 20. It is true that where the evidence supports an inference that a supervisor or coworker harboring discriminatory animus sabotaged an employee's performance in a manner that proximately caused her termination, a jury could reasonably conclude that the plaintiff was "set up to fail" for discriminatory reasons. *See Miller v. Polaris Laboratories, LLC*, 797 F.3d 486, 490 (7th Cir. 2015). In *Miller*, the plaintiff was terminated ostensibly for her failure to meet the employer's productivity quotas. The plaintiff did not dispute that she had consistently failed to meet the quotas, but she argued that her direct supervisor ("Ballard") and one of her colleagues ("Kemp") had interfered with her work in a way that "torpedoed her output," and that they had done so for

discriminatory reasons. *Id*. at 491. The Seventh Circuit concluded that the plaintiff was entitled to try her claim based on evidence that Kemp had said, while discussing the plaintiff's poor performance, "[i]t wouldn't bother me if that stupid nigger bitch did not come back here," and that Ballard (who on a separate occasion had referred to the plaintiff as the "colored girl") had laughingly agreed. *Id*. at 489-90. The court concluded that these remarks, together with the testimony of several witnesses who had personally observed Ballard and Kemp tampering with the plaintiff's work, and who had overheard Ballard making racist comments and remarks implying that she was intentionally making plaintiff's work more difficult, could lead a jury to conclude that the tampering was discriminatory and had proximately caused the plaintiff's termination. *Id*. at 491.

The evidence that plaintiff's termination was proximately caused by Reimers's discriminatory interference with her sales is far less compelling. Plaintiff argues that Reimers caused the decline in her sales by: refusing to make amends for defendant's manufacturing errors, causing her to lose IDL and Media on the Run as customers; refusing to credit plaintiff for sales she made to a customer called IMS in 2007, crediting them instead to a male colleague; blocking plaintiff from soliciting customers; and subjecting plaintiff to a hostile environment. Pl.'s Resp. at 20. Because I previously determined that the

last two claims are unsupported by the record, *see* Mem. Op. and Order of 3/27/15, DN 63 at 16-17 and n. 9, I discuss only the first two here.

With respect Reimers's alleged omissions in helping regain the goodwill of plaintiff's disappointed clients, even assuming that a jury accepted the theory that Reimers knowingly forfeited hundreds of thousands of dollars in business for defendant in order to manufacture a basis for terminating plaintiff, it would still need to find that Reimers did so with a discriminatory motive, and that his conduct proximately caused plaintiff's termination. The record does not reasonably support either of these inferences. Unlike in *Miller*, where the plaintiff's coworker and supervisor made racially derogatory remarks while contemporaneously expressing their hope that plaintiff would be terminated, and where the supervisor made additional comments suggesting that her actions were calculated to bring about that result, there is no evidence that Reimers's alleged omissions in repairing plaintiff's (and, by the same token, defendant's) relationship with her clients were motivated by gender-based animus. As noted above, Reimers twice used sexually offensive or explicit language during disputes with plaintiff. But there is no evidence that these vulgarities were related, either temporally or in any other manner, to his alleged failure to salvage plaintiff's accounts. Nor does plaintiff demonstrate

that Reimers behaved any differently with respect to male salespeople whose customers were dissatisfied with defendant's performance. Finally, plaintiff testified that performance problems had plagued her customers from as early as 2004, *see* Saboya Dep. at 76:9-79:2 (discussing performance problems on jobs for Value City, Niven, Bish, and HALO in the '04-'05 timeframe), undermining the inference that Reimers's mishandling of her customers' complaints proximately caused her termination.

With respect to plaintiff's claim that Reimers misallocated credit for certain of her 2007 sales to IMS, defendant admits the misallocation. But even assuming that gender discrimination can be inferred from the fact that a male colleague was given credit for the sales, there is no evidence to suggest that the failure to credit plaintiff for these sales influenced defendants' decision to terminate her. As I previously observed, "[t]he record does not reveal whether plaintiff's compensation (which at that time included both salary and commission) was affected" by the misallocation, DN 10-11, and plaintiff offers no evidence, nor any analysis, of how the correct attribution of these sales would have affected her overall sales results. Even assuming that the record supports her assertion that she was entitled to credit for "$138,000 in web press business" (though her string citation to multiple pages of three deposition transcripts and an email chain does

not appear to contain this figure), *see* Pl.'s L.R. 56.1 Stmt. ¶ 112, she does not show how the correct attribution of these 2007 sales would have materially altered the downward trajectory of her sales. Indeed, plaintiff does not dispute that sales to the IMS account were correctly attributed to her starting January 1, 2008, yet her total sales results continued to fall. In short, the record does not support the theory that Reimers, or any other employee, caused plaintiff's termination by discriminatorily interfering with her sales, or by refusing to credit her for sales she actually obtained.

I now turn to the comparator evidence. Mindful of the Seventh Circuit's admonishment that a plaintiff's burden at the prima facie stage is not onerous, and that the "purpose of the similarly-situated requirement is to provide plaintiffs the boost that the *McDonnell Douglas* framework intended," not to erect "an insurmountable hurdle," *Coleman*, 667 F.3d at 852 (internal quotation marks and citations omitted), I gave plaintiff "the benefit of the doubt," *see E.E.O.C. v. Our Lady of Resurrection Medical Center*, 77 F.3d 145, 148 (7th Cir. 1996), and rejected defendant's argument that she had not shown she was similarly situated to McLaughlin, Peshek, and Sousanis—three male employees whose 2008 total sales were, the evidence confirms, lower than hers. Even assuming, however, that these comparators were similarly situated, "'comparative' evidence is

dispositive for summary judgment purposes only if it shows 'systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic.'" *Id.* (citation omitted). Plaintiff's evidence clearly does not meet this threshold.

Defendant's supplemental L.R. 56.1 materials provide various 2008 and 2009 sales metrics for plaintiffs and her putative comparators, including total yearly sales, commissions earned, compensation paid, and the balance of commissions to compensation. Setting aside plaintiff's objections to this evidence, which I address below, the evidence facially reveals that in 2008, plaintiff's total sales for its two divisions—Segerdahl Graphics and Segerdahl Corporate—amounted to $1,452,991; that she earned a total of $143,167 in commissions; and that her total compensation[2] was $177,095, i.e., $115,385 in draw and $61,710 in commissions. Based on these figures, defendant calculates that plaintiff's total compensation in 2008 exceeded her earned commissions by $33,927.75.

---

[2] Defendant explains that this total does not include two weeks of salary plaintiff was paid at a rate of $220,000 before her compensation was converted to commission-only, nor does it include $6000 she received as an advance against auto expenses. Richford Decl. at ¶ 20, DN 67-1. The inclusion of those items presumably explains defendant's assertion, in its original L.R. 56.1 statement, that plaintiff's total compensation in 2008 was $191,556. Def.'s L.R. 56.1 Stmt., ¶ 14, DN 41.

The evidence further shows that in 2009, plaintiff's total sales for defendant's two divisions amounted to $500,071; she earned a total of $43,037 in commissions; and by the time of her termination in October of that year, she had been compensated $80,000 in draw. Based on these figures, defendant states that plaintiff's compensation in 2009 exceeded her earned commissions by $36,963.

An item-by-item recitation of the corresponding figures for plaintiff's comparators is unnecessary, since if defendant's records and testimony are taken at face value, it is clear from the numbers that none of the comparators was "in the hole" (i.e. compensated in excess of his earned commissions) as deeply or as consistently as plaintiff during the final years of her employment. Indeed, at the end of 2008, when plaintiff's commission deficit was $33,927, McLaughlin had a deficit of $7,365. But because McLaughlin entered 2008 with a commission surplus of $14,048,[3] his running total of commissions earned for the period January 1, 2007 through December 30, 2008 exceeded his commissions paid by $21,413. *See* Richford Decl. at ¶ 4 and Exhs. 1, 7. By September 30, 2009, when plaintiff's year-to-

---

[3] *See* Richford Decl., Exh. 1 col. 8; Rich. Decl. at ¶ 18 ("Column eight of Exhibits 1 and 2 shows the running total of each salesperson's commissions earned to the compensation they received at the end of the prior year, and shows whether the total was a positive amount or a negative amount."); Richford Dep. at 29:18-30:3 (explaining how to interpret column 8 using example of employee Edward Anderson).

date deficit was $36,936 and her cumulative deficit was $70,891, McLaughlin's year-to-date deficit was $9,362, and his running total was a surplus of $12,087.

The yearly and running balances of Peshek and Sousanis were also more favorable than plaintiff's over the same period. At the end of 2008, Peshek had a commission deficit of $948 (compared with plaintiff's $33,927). By September 30, 2009, Peshek's year-to-date balance was a positive $7,254 (when plaintiff's was a negative $36,936), and his running total was a surplus of $12,663. Sousanis, like plaintiff, had both annual and running deficits in 2008 (of $22,429 and $27,391, respectively). But by September 30, 2009, Sousanis had a year-to-date surplus of $28,317, and his running total at that time was surplus of $926.

On its face, this evidence roundly supports defendant's stated reason for plaintiff's termination. Indeed, although each of plaintiff's comparators was "in the hole" at some point, none ever had a deficit as large as plaintiffs, and all had surpluses by the time plaintiff was terminated with a cumulative deficit of $70,891. *See* Richford Decl. ¶¶ 14, 15, 21 and Exhs. 1, 2, 7, 8. Moreover, as of September 30, 2009, each comparator had total year-to-date sales greater than plaintiff's even in absolute figures: plaintiff's had $500,071 in total sales while McLaughlin and Sousanis each had over $1.6 million and Peshek

had $873,285.  *See* Richford Decl. at Exh. 2.  These figures, individually and collectively, support, rather than controvert, defendant's stated reason for plaintiff's termination.

Plaintiff articulates numerous objections to defendant's evidence, but none identifies the kinds of flaws that would reasonably suggest defendant's stated reason for her termination was "unworthy of credence."  *Coleman*, 667 F.3d at 852 (original alteration).  For example, she insists that defendant's evidence of her results does not account for certain sales for which she believes she should have been credited, including, in addition to the 2007 IMS sales discussed above, "Point-of-Purchase printing sales generated by Defendant's employees that should also be credited or assigned to Plaintiff based upon the business development/management nature of Plaintiff's job duties."  Pl.'s Resp. to Def.'s Supp. L.R. 56.1 Stmt., 2. Whatever merit there may be, however, to plaintiff's claim of entitlement to credit for these sales, she concedes that the records attached to the Richford Declaration do not reflect them, and she does not dispute that these are the records that formed the basis of management's evaluation of her performance. Accordingly, even if the records wrongly omit sales for which plaintiff should have gotten credit, that omission does not give rise to a reasonable inference of pretext.  The same is true with respect to the reports' alleged omission of "direct and

indirect sales Plaintiff generated and earned with a team of sales employees that were credited or assigned exclusively to male employees instead of Plaintiff." Pl.'s Resp. to Supp. L.R. 56.1 Stmt. at 2-3, 6-7.

It is true, as plaintiff observes, that defendant has given inconsistent accounts of plaintiff's sales figures over the course of these proceedings. The only material inconsistency, however, relates to plaintiff's 2008 sales, which defendant initially stated were $730,622, then later acknowledged were approximately $1.4 million. The difference between these numbers is indeed significant. Still, when the record is viewed as a whole, their impact on the credibility of defendant's stated reason for plaintiff's termination is negligible. Regardless of whether plaintiff's sales abruptly declined between 2007 and 2008, or whether they instead plateaued in those years after a pronounced drop between 2006 and 2007 and before another significant fall between 2008 and 2009, there is no dispute that plaintiff's sales results evolved over time in only one direction: downward. There is likewise no dispute that at the time of her termination, plaintiff's total sales volume was less than forty percent of what it had been at the time of her hire. She points to no evidence suggesting that any male employee with a similar sales record retained his job.

There is another anomaly in defendant's 2008 numbers. The evidence shows that in that year, defendant paid plaintiff a total of $177,095, including $115,385 in draw and $61,710 in commissions. Why would it have made those commission payments if, as all agree, her draw that year was $120,000 and her commission deficit was $33,927? The record leaves this mystery unsolved. In plaintiff's view, it shows that she "could not have been paid more than she earned." Pl.'s Resp. to Def.'s Supp. L.R. 56.1 Stmt. at 2. She does not elaborate the argument beyond this statement, but I assume she means that if, as defendant contends, her draw was "against" commissions, then the fact that she was paid *more* than her draw means that she must actually have earned more than $120,000 in commissions.

Defendant's numbers are indeed curious. Still, not every peculiarity in the evidence raises an inference of pretext, and it is plaintiff who must ultimately marshal the facts into a compelling theory of discrimination. *See Luster v. Illinois Dept. of Corrections*, 652 F.3d 726, 732 (7th Cir. 2011). Nothing in plaintiff's opposition papers hints at how she intends to do so.

Plaintiff tries to impugn defendant's account of her commission by pointing to a draw letter Peshek received on January 8, 2004, which included the statement, "2003 Deficit will be waived." *See* Pl.'s Resp. to Def.'s L.R. 56.1 Stmt.,

Exh. 7. In plaintiff's view, the absence of a similar statement in her draw letter from January of 2009, together with evidence that defendant "continued to pay" her in 2009, despite her deficit, suggests she did not, in fact, have a deficit at the end of 2008. But that interpretation not only conflicts with defendant's affirmative evidence, it is belied by plaintiff's acknowledgement that she lost her "steady work" from several clients during that time frame, and that her draw was reduced for that reason. *See* DN 63 at 3-4; Pl.'s L.R. 56.1 Stmt. ¶ 118.

At all events, for plaintiff to survive summary judgment, her comparator evidence must reasonably suggest "systematically more favorable treatment" of male employees. *Our Lady of Resurrection Medical Center*, 77 F.3d 145 at 148. Whatever we are to make of defendant's impenetrable accounting of her 2008 commissions, plaintiff offers no analytical bridge between defendant's calculations and any systematically better treatment of her comparators. To the contrary, the comparison plaintiff elicits between Peshek's 2004 draw letter and her own 2009 draw letter solidifies the impression that in all material respects, the two employees were treated indistinguishably: their previous year's commission deficits were waived, their draws were adjusted, and they continued to be paid on a draw-against-commissions basis. Moreover, Peshek was ultimately terminated for "unsatisfactory sales results" less than a year after

plaintiff was terminated for the same reason. Def.'s L.R. 56.1 Stmt., Exh. 28 at ¶ 8; *see also* Reimers Dep. at 146:6-9.

The remaining "bits and pieces" plaintiff invokes, such as evidence that defendant wanted or intended to oppose plaintiff's post-termination claim for unemployment (though its HR Manager admits it had no basis for doing so, and did not, in fact, do so), fall even shorter of raising a reasonable inference that defendant's stated reason for her termination was a pretext for discrimination.

## III.

For the foregoing reasons, defendant's motion for summary judgment is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 6, 2016